STATE of South Dakota, Plaintiff
and Appellee,

v.

Marshall Ray OLSON, Defendant
and Appellant.

No. 16493.

Supreme Court of South Dakota.

Argued Sept. 11, 1989.

Decided Dec. 6, 1989.

Roger A. Tellinghuisen, Atty. Gen., Wade A. Hubbard, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Drake A. Titze, Minnehaha County Public Defender, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

After a jury trial, Defendant/Appellant Marshall Ray Olson (Olson) was convicted of two charges of escape, first-degree burglary, first-degree rape, and second-degree robbery. At the times these incidents took place, Olson was serving a ten-year sentence in the State Penitentiary for escape and was on trusty status.

A trial to the court was later held on charges that Olson was a habitual criminal. The trial court reserved judgment until the

prosecutor submitted transcripts of plea hearings in earlier cases involving Olson.[1] Later, in Olson's absence, the trial court determined him to be a habitual offender.[2] Olson appeals, asserting five errors by the trial court:

1. His confession to a prison official was unlawfully obtained by coercion in absence of Miranda warnings;

2. Count 1 (escape on October 26, 1986) should have been severed from the other counts;

3. Evidence was insufficient for Count 1 (escape) to go to the jury;

4. The Part II Information should have been dismissed under the 180–day rule (SDCL 23A–44–5.1); and,

5. The habitual criminal conviction is invalid because judgment was never rendered in open court, and he was not present when the trial court received transcripts of his plea hearings in previous cases.

### Holding

We affirm all judgments of guilt and conviction and the sentences entered below.

### FACTS

On Sunday, October 26, 1986, Olson was escorted by Richard Mesch from the state penitentiary to the Church of the Bible, located in Sioux Falls, as Olson, a prison "trusty" (despite an earlier escape), had permission to attend a religious service there. Mesch, a lay minister affiliated with the Crossroads Prison Ministry, brought along his wife and daughter. The party of four entered the church, and Olson sat, separately, in the back. Religious service began at 6:30 p.m. and ended at about 8:15 p.m.

At the midpoint of the service, or shortly before, Mesch looked back to the area where Olson had been sitting and noticed that Olson was gone. At the end of the service, forty-five minutes to an hour after Olson was missed, Mesch and other church members searched for Olson. The basement, parking lot, church perimeter, inside rooms and "prayer tower" were all searched. Younger church members drove along nearby streets, but did not see him. After 20 to 25 minutes of search, Mesch notified the "penitentiary control room", by telephone, that Olson was missing. Twenty minutes later, Olson walked in the front door of the church. When Mesch asked him where he had been, Olson replied that he had been behind the church smoking. Mesch called the penitentiary again. He was told to return Olson to the penitentiary control room rather than the penitentiary "cottage" to which Olson, as a trusty, would normally have been taken. Olson was logged as returning to the penitentiary at 9 p.m. At trial, Mesch estimated that Olson was gone for over two hours. Olson, about two weeks later, told Steven Lee, the Deputy Program Director (an assistant to the warden) at the penitentiary, that he left the church for the purpose of exposing himself to someone, but changed his mind. This conversation occurred, informally, in the prison weight room.

Factually, we set the crime scene. At 2:50 a.m. on November 17, 1986, victim was awakened in her bed. She lived in a basement apartment in a private home, very near the church from which Olson had wandered on October 26. A bright light (apparently a flashlight) was shining in her eyes. She screamed. A man, whom she could not later identify because she was first dazzled by the light and then blindfolded with her own socks, placed a sharp object against her face and said: "Shut up. Shut up or I'll kill you." He was breathing

---

1. Olson had filed a "motion to strike or vacate" the Part II Information alleging two prior felonies on June 2, 1988, the day before the habitual offender trial.

2. Olson, a prisoner in the State Penitentiary, was sentenced to ten years on Count 1 (escape on October 26, 1986), ten years on Count 2 (escape during the night of November 16–17, 1986—the night of the rape), ninety years on Count 3 (burglary), ninety years on Count 4 (rape), and ten years on Count 5 (robbery). Terms for Counts 1, 2, and 3 were to be served consecutively, with terms for Counts 4 and 5 to be served concurrently with the term for Count 3.

hard at the time.[3] Her assailant, who had pried open a window to gain entry (Olson, employed as a janitor at the prison, had access to both flashlights and screwdrivers, according to trial testimony), threatened her life three times in quick succession while muffling her mouth with his hand. When he removed his hand, victim was quiet, afraid for her life. The assailant advised her that she would not be hurt if she obeyed him, and removed her underwear. He tied her hands behind her back and proceeded to rape her several times. After finishing, he dressed himself and asked her if she had any money. She directed him to her purse, where she had $18.00. Still blindfolded, she then heard her purse or wallet click, and the assailant took her money. He eventually untied her and left, at which time victim thanked him for not hurting or killing her. She removed her blindfold and found the phone disconnected by the assailant. Victim, who married in the interval between the rape and Olson's trial, reconnected the phone and called her future mother-in-law, who accompanied her to Sioux Valley Hospital's emergency room.

Police investigating the crime scene removed hair, blood, and semen samples. Liquid blood samples were later drawn from Olson, victim, and her boyfriend, now her husband, for analysis and comparison. Victim, her boyfriend, and Olson were all determined to have type A blood, but "genetic markers" in Olson's blood distinguished his from the others. Comparing Olson's blood characteristics to those found in a semen stain on victim's bedsheet, Rex Riis, the state's forensic scientist, testified at trial that the semen stain could be produced by 20 percent of the Caucasian population, including Olson. Dr. Ilya Zeldes analyzed hair samples found one hair strand, of four taken from victim's bedsheet, which was consistent with Olson's hair. This hair was not from either victim or her boyfriend.

3.  Olson, in a later confession made to Lee, said that he had walked and run from the penitentiary cottage to victim's apartment, having fol-

## Appellant Initiates Conversation on His Criminal Conduct

Burdened, apparently by his guilt, on November 20, 1986, Olson approached Lee, a counselor in the prison weight room locker area. Lee was changing clothes in preparation for a workout. They exchanged hellos, and Olson raised the topic of a former inmate, Dan Cady, who was involved in a rape case in Rapid City. Both Olson and Lee remarked on the stupidity of such an act. Lee, who counseled Olson, sometimes as often as three times a week, asked Olson: "How is it going for you?" Olson gave a negative answer which Lee considered unusual. Olson asked Lee: "What would you or what would a staff member need to do if someone told them something bad that they had done? Would you need to report it?" Lee testified at trial as to what happened next:

> I thought about it for a few minutes and I guess my response was something like, my personal rule is that if it affects the individual negatively and if it's potentially threatening or damaging to that person or someone else, then I would feel obligated to report it.

In Lee's words, Olson carried on:

> Well, he [Olson] seemed to take a few minutes to kind of think things over a little bit. And then his remark was, well, this is something that's already happened, so, you know, I guess I can tell you. It's not going to hurt anyone. And then he said, can I trust you, and I said, well, if it goes along with what I told you before, that it's not potentially dangerous for you or for someone else, yes, you can tell me.

Lee related that Olson then confessed:

> He [Olson] asked me if I read about the rape case that had been in the paper that week and I said, you mean the one in Monday's paper, and he said yes, that's the one. I said, yes, I read it. *And he looked at me and he said, well, I did it.* (emphasis supplied).

lowed her home during his October sojourn from the church.

Lee's response was disbelief, but Olson repeated his claim. Lee, knowing Olson was supposed to be in the prison "cottage" at the time the rape occurred, asked him how he could manage that. Olson remarked that it was not that difficult, and made references to the cottage schedule and a garbage pick-up. Lee testified that Olson then sensed Lee's difficulty in absorbing his bombshell, and the conversation changed into a discussion of treatment for Olson's problems. After a duration of 60–80 minutes, they separated, and Lee advised Olson that he would do nothing "without talking to him again."

Lee still could not believe what Olson had told him. He eventually went home and talked the matter over with his wife. He reread the newspaper article about the rape, and noticed that it indicated that the rape occurred in an apartment, whereas Olson had stated that it took place in a home. Lee decided that he needed more details to decide whether Olson was truthful and returned to the prison at 8:30 p.m. He found Olson cleaning up the administration building. They went back to the locker room and resumed their conversation. Lee said he needed more details. Olson asked Lee what he needed to know. Lee asked questions, and Olson answered, apparently quite willingly. Olson described the apartment as part of a home basement, described his journey from the cottage and back, and located the rape scene near the church he had escaped from in the Augustana area (newspaper accounts reported the crime scene only as an apartment in the southern part of the city). Regarding the rape itself, Olson related that he had threatened victim with a pen, but told her it was a knife, and admitted blindfolding her, making her unable to identify him. Olson made a specific reference to victim's thanking him for not hurting her. As the conversation continued, according to Lee, Olson became increasingly uncomfortable, and appeared to show remorse. The tenor of the conversation remained calm, however, and Lee did not become accusatory in manner. Lee informed Olson, midway through this talk, that he could not keep the matter to himself. Lee suggested that

Olson speak to the warden, or duty-captain, or security personnel, but Olson was unwilling, and pleaded with Lee to give him time to consider his options. Lee agreed to simply advise the cottage security staff to keep a close watch on Olson that night. Olson and Lee then left, going their separate ways. Lee informed both the cottage security officer and duty officer at the penitentiary control room that Olson was upset. He asked them to watch him.

The next morning, Lee went to the cottage and asked Sergeant Walters where Olson's room was. To Lee's amazement, Walters replied that Olson "really did it" this time" by lying to Lee. Troy Haase, Olson's roommate at the cottage, reacted just as Walters had. Olson had already begun spreading a story that he had told "this terrific lie" to Lee. Lee, shortly thereafter, went to the warden's office and reported Olson's tale.

## DECISION

I. *Miranda Warnings Were Unnecessary Under This Set Of Facts.*

■ Olson first argues that his confessions should have been suppressed because Lee was a law enforcement official who coerced him into confessing. We totally disagree. He relies on SDCL 22-1-2(22), which defines "law enforcement officer" as:

[A]n officer or employee of the state or any of its political subdivisions ... who is responsible for the prevention or detection of crimes, for the enforcement of the criminal or highway traffic laws of the state, *or for the supervision of confined persons convicted of a crime* [.]

He further cites SDCL 24-1-11, which provides that "all officers and persons employed by the State Penitentiary shall perform such duties as may be required of them by the warden" and that standards for such employees and officers "shall be consistent with those standards of personal conduct required of law enforcement personnel." However, Lee's actual duties were those of an administrator or counselor. He was not involved in crime detection

or security duties. It is noteworthy that SDCL 24–1–11 distinguishes between penitentiary officers and employees and "law enforcement personnel" by directing that their standards of "personal conduct" shall be "consistent" with those of "law enforcement personnel." If they are all law enforcement officers, as Olson argues, the "standards" provision in SDCL 24–1–11 is patently redundant. Lee was not, under these statutes, a law enforcement agent.

Olson was not subjected to "police interrogation" in circumstances which mandated *Miranda* warnings:

> The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any way.

*Satter v. Solem*, 434 N.W.2d 725, 726 (S.D. 1989) (quoting *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966)). No "police" or their equivalent were involved here.

In the particular factual scenario presented here, we do not consider Lee, as an administrator and counselor, to be a law enforcement officer under the statutes Olson relies upon, nor did he act as such. His status is analogous to that of a parole officer and, under this Court's holding in *State v. Johnson*, 87 S.D. 43, 46, 202 N.W.2d 132, 134 (1972), he is more aptly viewed as "the antithesis" of a law enforcement officer. "His duty begins when the peace officer's duty ends", *Johnson, id.* Lee, we note, did not act or react as a law enforcement official and reported the incident *after* Olson made it common knowledge at the penitentiary. There are no indications of coercion on Lee's part; Lee had absolutely no idea what facts were unfolding when Olson began to tell his story. No investigation was under way at this time nor was Olson suspected of this crime. Olson knew Lee for two years before the incidents under consideration, regularly met Lee for counseling, and was specifically warned that Lee would report information regarding potential harm to inmates or others (a rapist with access to the public is clearly within the scope of Lee's initial advice to Olson). Olson was not in a situation remotely akin to that of a prisoner who makes incriminating statements to an undisclosed undercover police agent of the sort considered in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Olson's incarceration, while a relevant factor in determining whether *Miranda* warnings are required, is not, in itself, determinative. *Henry*, 447 U.S. at 273–4, 100 S.Ct. at 2188–9, 65 L.Ed.2d at 124. Lee was not a fellow inmate whose "conduct and apparent status as a person sharing a common plight" could bring into play "subtle influences" coercing Olson into incriminating himself. *Henry, id.* Lee was not investigating allegations against Olson (none had been made), had no duty to do so, and the conversations occurred in the non-coercive environment of a locker room, facts which distinguish this case from *Walker v. State*, 102 Nev. 290, 720 P.2d 700 (1986), wherein incriminating statements uttered to a prison "unit counselor" responsible for and in the course of an investigation, were deemed inadmissible. This was not an interrogation looking toward prosecution. *Whitfield v. State*, 42 Md.App. 107, 400 A.2d 772, 783 (Md.Sp.App.1979). The mere fact that incriminating statements are made by a prisoner does not necessarily render them inadmissible. *State v. LaRue*, 19 Wash.App. 841, 578 P.2d 66 (1978). As Lee was not, in these circumstances, a law enforcement official or agent, and did not conduct an "interrogation", we reject Olson's argument that *Miranda* warnings were necessary.

II. *Severance—No Abuse Of Discretion As First Escape Is Intertwined With Second Escape And Rape.*

■ Olson next asserts that the trial court erred in refusing to sever his October escape count and try it separately. This is unsound. The decision not to sever is reviewed under the "abuse of discretion" standard. *State v. Layton*, 337 N.W.2d 809, 815 (S.D.1983). In *Layton*, this Court observed that a "systematically concerted

sequence of violent events" occurred. *Id.* Here, Olson, per Lee's testimony, saw and followed his victim to her home in his October escape. In his November escape, he returned to that place, forced entry, and raped her. This nexus of facts linking the two escapes reduces Olson's argument to a shambles. No abuse of discretion occurred here. Offenses may be charged together, under SDCL 23A–6–23 "two or more acts or transactions [are] connected together or constitut[e] parts of a common scheme or plan." Such was the case here.

### III. *Sufficiency Of Evidence.*

■ Olson maintains that evidence was insufficient for the jury to find that he was guilty of escaping during his church trip. We disagree. As we wrote in *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988):

> In determining the sufficiency of the evidence on appeal, the question presented is whether there is evidence in the record, which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Banks*, 387 N.W.2d 19, 27 (S.D.1986) (citing *State v. West*, 344 N.W.2d 502 (S.D. 1984)). In making this determination, the court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Banks, id.*

SDCL 22–11A–1 defines the crime in question:

> The term "escape" when used in this chapter includes departure without lawful authority *or* failure to return to custody following a temporary leave granted for a specific purpose or limited period.

SDCL 22–11A–1 also specifies that a prisoner "at the time of his escape need not be in a place designated for the keeping of prisoners." The facts here speak for themselves. Olson told Lee, in a conversation *before* the challenged confessions, that he left the church to expose himself; he was gone for two hours. This was not an authorized leave, but departure without lawful authority. He not only left the church,

but left the environs, for his own purposes. This allegation of error is absurd.

### IV. *180–Day Rule Does Not Apply To Habitual Offender Proceedings.*

Olson next argues that his case should have been dismissed under SDCL 23A–44–5.1, and that the record of this habitual offender proceeding is fatally incomplete. These arguments intertwine and will be considered together.

SDCL 23A–44–5.1 provides:

> The prosecution shall dispose of all criminal cases by plea of guilty or nolo contendere, trial or dismissal within one hundred eighty days from the date the defendant has first appeared before a judicial officer on the complaint or indictment. Any period of delay shall be excluded if the trial court finds good cause for the delay. In the event of the prosecution's failure to dispose of the action within the time limit required by this section, the action shall be dismissed.

Olson first appeared in court on December 9, 1987, at his arraignment, the same day the Part II Information alleging two prior convictions was filed. He was convicted of the primary charges, after jury trial, on May 24, 1988, 167 days after his initial appearance.

■ "Being a habitual criminal is not a separate offense, rather the punishment for the principal crime is enhanced to a higher class of felony (SDCL 22–7–7 *et seq.*)." *State v. Cady*, 422 N.W.2d 828, 831 (S.D.1988). Considering this in conjunction with the plain language of SDCL 23A–44–5.1, which directs that all criminal cases shall be disposed of in 180 days, we hold that the 180–day rule has no application to habitual offender proceedings. Regarding Olson, his "criminal" case on the substantive changes, envisioned in SDCL 23A–44–5.1, was disposed of, by trial, on May 24, 1988. This was 167 days after his initial appearance. The 180–day rule was clearly satisfied.

### V. *Olson's Absence From Segments Of His Habitual Offender Proceedings.*

■ Olson's last argument, that there was no final disposition at all because the

trial court did not, in his presence, pronounce him "guilty" as an habitual offender, and that he was not present when transcripts were received by the court, do not merit reversal.

SDCL 23A–39–1 provides:

A defendant shall be present at his arraignment, at the time of his plea, at every stage of his trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as provided by SDCL §§ 23A–39–2 and 23A–39–3.

We first observe that a defendant's right to be present at return of the verdict, referenced in SDCL 23A–39–1, applies only to jury trials. *See, Davis v. State*, 416 So.2d 444 (Ala.Cr.App.1982) and *Bailey v. State*, 419 A.2d 925 (Del.1980).

■ Secondly, Olson's absence when the trial court received these transcripts of his prior plea hearings created no prejudice. He could not "confront" cold, dead transcripts from court records. As the United States Supreme Court has observed:

Respondent argues that his rights under the Due Process Clause of the Fourteenth Amendment were violated by his exclusion from the competency hearing. The Court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." (citation omitted). Although the Court has emphasized that this privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow," (citation omitted) due process clearly requires that a defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence," (citation omitted). Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

*Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631, 647 (1987). These transcripts were accepted by the trial court taking judicial notice of prior criminal proceedings. No real prejudice is apparent here. Constitutional error which could not affect the outcome can be deemed harmless. *Miller*, at 36. Importantly, the lack of prejudice is reflected in Olson's objections to the trial court's findings of fact and conclusions of law, which only asserted a lack of factual basis for plea, not constitutional issues. Reversal is not warranted on this point.

Affirmed.

All the Justices concur.