(898 P.2d 653)
No. 71,550

STATE OF KANSAS, *Appellee,* v. CHAD BENOIT, *Appellant.*

Opinion filed June 23, 1995.

*Steven R. Zinn,* deputy appellate defender, and *Jessica R. Kunen,* chief appellate defender, for appellant.

*Brandi L. Dunning,* assistant county attorney, *Robert Forer,* county attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before ELLIOTT, P.J., GREEN, J., and MARLA J. LUCKERT, District Judge, assigned.

GREEN, J.: Chad Benoit was convicted of one count of attempted aggravated escape from the Labette Correctional Conservation Camp (Labette), in violation of K.S.A. 1994 Supp. 21-3301 and K.S.A. 1994 Supp. 21-3810. Before Benoit's conviction, the trial court determined that Officer Qualls, a Labette correctional officer, and Walter Whorten, Labette's administrator, were not required to furnish Benoit with a *Miranda* warning before questioning him about his alleged escape attempt. On appeal, Benoit contends the trial court erred in determining that those individuals were not required to give him a *Miranda* warning. Because we agree that a *Miranda* warning should have been given under the circumstances of this case, we reverse and remand this case with directions that Benoit's confession to Whorten be suppressed.

## FACTS:

In the summer of 1993, Benoit pled guilty to burglary and felony theft. The trial court sentenced him to one to five years' and to one to two years' imprisonment, with both sentences running concurrently. The trial court suspended Benoit's sentences and assigned him to Labette for 180 days under K.S.A. 1994 Supp. 21-4603(b)(6). Labette is a minimum security "boot camp", which is authorized under K.S.A. 1994 Supp. 75-52,132 for young, nonviolent felony offenders. Benoit arrived at Labette in the summer of 1993.

The events that led to Benoit's conviction for attempted aggravated escape occurred within a week after he arrived at Labette. One night Benoit was assigned to Barracks A, which had 42 beds. Inmates were permitted to leave their beds only to use the restroom or for medical attention. Judy Collins, a correctional officer at Labette, was in the control room overlooking the barracks that night. She testified that she saw an individual who was bent down at the back door "putting his red ID badge between the lock and the door facing." That door, which had electrical locks, led to an outdoor exercise area surrounded by a six-foot fence topped with barbed wire.

Officer Collins further testified that she was approximately 60 feet away from the person and that the barracks area was well

lighted. She said the person, whom she could not initially identify, was below a window located near the top of the door. After observing that person, Collins notified two other correctional officers who were in the control room. They were Officer Qualls and Officer Porter. She stated that when the officers entered the barracks, she saw the person start crawling towards his bunk area. She then saw the person stand up when he was halfway back to his bunk. Collins then identified the person as Benoit.

Qualls testified that after Collins informed him that someone was at the back door of the barracks, he could see a person's arm with his hand on the door knob. Qualls stated that the barracks room was slightly darker than the courtroom and estimated that the person was 35 to 50 yards away when he entered the barracks. When Qualls saw the person crawling towards him, he asked the person to stand up. Qualls then identified the person as Benoit. Benoit had his red ID badge in his hand. Qualls testified that he asked Benoit what he was doing and Benoit initially said he was doing nothing. Qualls further testified that after he told Benoit that he and the other correctional officers had seen him, Benoit said he was trying to jimmy the door to get out.

Benoit was then transported to the Labette County jail. Walter Whorten, the administrator at Labette, testified about a conversation he had with Benoit two days after his alleged attempted escape. He specifically asked Benoit if he had made an attempt to escape, and Benoit answered affirmatively.

The charge against Benoit was initially tried in the fall of 1993, and the trial ended in a mistrial. In the first trial, the court ruled that because Qualls and Whorten were not required to give a *Miranda* warning to Benoit before questioning him, they could testify about Benoit's confessions. In explaining its rationale why a *Miranda* warning was unnecessary, the trial court stated:

"Well, my interpretation of the facts and the law as I understand this case and the role of the employees at the camp, these correctional officers are employees of a private business. They are not employees of the county. They're not employees of the state. They are not in any sense law enforcement officers.

"The Department of Corrections has contracted with Labette County to operate this facility as a contract facility; and Labette County, in turn, with the

approval of the Department of Corrections, has subcontracted the management and operation of the camp with a private company.

"So the employees, the administration and the correctional officers in the Labette Conservation Camp are not law enforcement officers. They have no law enforcement rights whatsoever. And they are charged with operating the conservation camp and operating it in a safe way in accordance with all of the standards of both the State Correctional Association and the American Correctional Association.

"So as far as a ruling in this case is concerned, my interpretation of the law, and I think the interpretation that needs to be applied is that there is no duty on the part of the employees in the camp to give a *Miranda* warning."

Before the second trial, the State filed a motion in limine to preclude any reference to the fact that Benoit was not given a *Miranda* warning. The State claimed defense counsel's cross-examination in the first trial about Qualls' and Whorten's failure to give Benoit a *Miranda* warning was overly prejudicial to the State. The State claimed many of the jurors felt Benoit's constitutional rights were violated when he did not receive such a warning before being questioned. The trial court granted the State's motion, and all references to *Miranda* were kept from the jury.

During the trial, Benoit testified that he was not attempting to escape when Collins spotted him in the barracks. Benoit stated he felt intimidated not only by the staff at Labette but also by the Labette facility. He explained that he had gone to the door at the back of the barracks in order to look out the window "to get [his] mind off the place 'cause [he] was nervous and everything." He stated he knew the door was electronically locked and he knew the door led to a fenced area. And he stated it would be "stupid" to try to escape that way.

## WAS BENOIT ENTITLED TO A *MIRANDA* WARNING?

Benoit argues that because Qualls and Whorten perform a State function by ensuring the custody of inmates that are sent to Labette, they act not as private citizens, but as agents of the State; consequently, they should have given Benoit a *Miranda* warning before questioning him. He argues that because he did not receive such a warning, his Fifth Amendment right against self-incrimination was violated.

To the contrary, the State argues that just because the Labette facility is created by the State and Labette is paid under a contract with the State, those factors alone do not create "State action" for law enforcement purposes.

Both parties agree that the question of whether Qualls and Whorten are required to furnish Benoit with a *Miranda* warning is a question of law, and our review is unlimited. See generally *State v. MacDonald,* 253 Kan. 320, 321, 326, 856 P.2d 116 (1993).

*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), prevents the prosecution from using statements, whether inculpatory or exculpatory, stemming from a custodial interrogation, unless the prosecution proves that procedural safeguards were used to secure the waiver of defendant's privilege against self-incrimination. These safeguards include informing the person in custody, before interrogation, of his or her right to remain silent, right to speak with an attorney, and right to have an attorney present during questioning. If the person asks for an attorney, then all questioning must cease until the attorney is present. 384 U.S. at 444-45. See *State v. Cady,* 254 Kan. 393, 402, 867 P.2d 270 (1994); *State v. Leroy,* 15 Kan. App. 2d 68, Syl. ¶ 1, 803 P.2d 577 (1990).

The purpose of a *Miranda* warning is to protect a putative defendant against the compulsion to incriminate himself arising from an official custodial interrogation. *Battie v. Estelle,* 655 F.2d 692 (5th Cir. 1981). A "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 444. However, the requirements of *Miranda* apply only when the suspect is interrogated by law enforcement officers or their agents. *United States v. Parr-Pla,* 549 F.2d 660 (9th Cir. 1977), *cert. denied* 431 U.S. 972 (1977) (court did not require *Miranda* warnings for statement made to a private investigator employed by a hotel).

The Labette facility is authorized by K.S.A. 1994 Supp. 75-52,132, which provides in pertinent part:

"The secretary of corrections and the board of commissioners of Labette county are hereby authorized to enter into agreements to establish and operate a com-

munity correctional conservation camp in Labette county. The county of Labette is hereby authorized to construct, equip and operate such community correctional conservation camp pursuant to such agreements."

Additionally, inmates may be assigned to Labette under K.S.A. 1994 Supp. 21-4603(b)(6) following a conviction of a crime. The director of Labette is also required to provide the sentencing court with a performance report under K.S.A. 1994 Supp. 21-4603(f). Further, an inmate is entitled to receive credit against his sentence for time spent in the camp under K.S.A. 1994 Supp. 21-4614a. Benoit contends those factors show that Labette exists solely because of State action.

Although Benoit concedes that Labette is run by a private business, he contends that this does not alter the fact that Labette operates "under color of state law." Benoit cites several cases in support of this contention, including *West v. Atkins*, 487 U.S. 42, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988), where the United States Supreme Court found that a private physician, who provided medical services to the inmates at a state prison facility under a contract with the state, acted under the color of state law for purposes of an inmate's § 1983 action against the doctor for failure to provide adequate medical care. 487 U.S. at 43. The Court specifically determined that "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." 487 U.S. at 55-56.

Benoit also cites *Estelle v. Smith*, 451 U.S. 454, 467, 68 L. Ed 2d 359, 101 S. Ct. 1866 (1981), where the United States Supreme Court considered the testimony of a court-appointed psychiatrist, who was allowed to testify during the penalty phase of the proceedings, regarding statements which the defendant had made without *Miranda* warnings. The Court held the absence of *Miranda* warnings violated the defendant's Fifth Amendment privilege against self-incrimination. The Court concluded:

"When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essen-

tially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."

On the other hand, the State argues the "State action" created in the previously mentioned cases did not rise to the level of "State action" necessary for law enforcement purposes. The State contends *West v. Atkins* is distinguishable for that reason. Otherwise, the State contends that the mandates of *Miranda* would extend to anyone merely because they were "acting under color of state law." The State further contends absurd results will occur if this rationale is adopted.

## WERE QUALLS AND WHORTEN LAW ENFORCEMENT OFFICERS?

The State argues that neither Qualls nor Whorten was acting as a law enforcement officer or as a law enforcement agent when he questioned Benoit. The State further argues that (1) the correctional officers at Labette are essentially security guards paid for and contracted by a private organization; (2) the correctional officers have a duty only to maintain security and to ensure that inmates at the camp follow the programs; and (3) the correctional officers do not even have the appearance of law enforcement officers, because they do not carry a weapon in their work.

The State's argument that the Labette correctional officers are not law enforcement officers is flawed. Under the Kansas Criminal Code, a "law enforcement officer" is defined as follows:

" 'Law enforcement officer' means any person who by virtue of such person's office of public employment is vested by law with a duty to maintain public order or to make arrests for crimes, whether that duty extends to all crimes or is limited to specific crimes or *any officer of the Kansas department of corrections* or for the purposes of K.S.A. 21-3409, 21-3411 and 21-3415 and subsection (a)(2) of K.S.A. 21-3413 and amendments thereto, any employee of the Kansas department of corrections." (Emphasis added.) K.S.A. 1994 Supp. 21-3110(10).

Consequently, the correctional officers of Labette may be considered law enforcement officers if they are officers of the Department of Corrections.

First, Labette is a correctional facility because K.S.A. 75-52,127 states:

"On or after the effective date of this act, the secretary of corrections may establish conservation camps to provide inmates with a highly structured residential work program. Such conservation camps shall be a state correctional institution or facility for confinement under the supervision of the secretary. A conservation camp may accept defendants assigned to such camp as provided in K.S.A. 21-4603 and amendments thereto."

Next, although Labette is considered a private enterprise under K.S.A. 75-5288, Labette's employees are ultimately accountable to the Secretary of Corrections. Under K.S.A. 1994 Supp 75-5205(a), the Secretary of Corrections shall have "the general supervision and management of the correctional institutions of the state . . . [and] general supervision, management and control of any manufacturing or other business that may be carried on in behalf of the state." Last, "[t]he authority of the secretary of corrections over the institutions of the department of corrections and the inmate thereof shall not be diminished by this section [K.S.A. 75-5288]." K.S.A. 75-5288(d). Consequently, both Qualls and Whorten, whose main duty is to ensure the custody of inmates and the safety of fellow employees and citizens from those inmates, fit within the definition of law enforcement officers under K.S.A. 1994 Supp. 21-3110(10).

## WERE QUALLS AND WHORTEN LAW ENFORCEMENT AGENTS?

Even if the State's contention is correct that neither Qualls nor Whorten was acting as a law enforcement officer, we still must consider if either of them was acting as a law enforcement agent.

Benoit cites the case of *Commonwealth v. A Juvenile*, 402 Mass. 275, 278, 521 N.E. 2d 1368 (1988), which is factually similar to this case. In *Commonwealth*, the trial court suppressed a juvenile's confession to the assistant director of a home for troubled adolescents. The home was a private, nonprofit organization under contract with the Department of Youth Services for the state of Massachusetts. In affirming the trial court, the appellate court stated that "Borden [assistant director] testified that he had a duty to report to the police if he learned a juvenile had committed a crime. He was not acting as a private citizen. Therefore, cases on which

the Commonwealth relies concerning private citizens with no police connection do not apply here." Moreover, the *Commonwealth* court concluded that Borden "was in 'an enforcement status' with respect to the juvenile. A finding [by the district court] that Borden was functioning as an instrument of the police was warranted, and therefore, the juvenile was entitled to *Miranda* warnings."

Similarly, in *People v. Robledo*, 832 P.2d 249 (Colo. 1992), the defendant, after his arrest but before the charges were filed, was incarcerated in a juvenile detention center. While there, the defendant asked to speak to Earl Redmond, a counselor whom he had known from past experiences. During their conversation, the defendant told the counselor his side of the story, including that he had shot the victim out of anger after a fight.

The defendant argued that his statements to the counselor should be suppressed because they were made before he was advised of his *Miranda* rights and were, therefore, constitutionally involuntary. The trial court held the defendant was in custody, the counselor was an agent of the State, and the defendant should have been *Mirandized*. The State appealed, contending that a *Miranda* warning was not required because the counselor was neither a law enforcement official nor acting as an agent of a law enforcement official.

In addressing two other cases applicable to the case it was considering, the appellate court stated:

"The People also cite *United States v. Morales*, 834 F.2d 35 (2nd Cir. 1987), where statements made to a physician's assistant at a correctional facility were held admissible. The statements were admissible because the physician's assistant had no investigative purpose, had no responsibility to investigate, and was only questioning the defendant out of curiosity. Redmond's [counselor] responsibilities, however, included a duty to work with the juveniles and his questioning did not stem from mere curiosity but occurred after reading the defendant's police report and discussing the case with the probation officer. In *State v. Olson*, 449 N.W. 2d 251 (S.D. 1989), a case which the People find particularly analogous to this case, a counselor at a prison was deemed not to be a law enforcement officer. Unlike Redmond, however, that counselor had no duty to report incidents he learned about through interviews with the inmates. Furthermore, in *Olson*, no investigation was under way when the defendant made incriminating statements to the counselor." 832 P.2d at 251.

The *Robledo* court ultimately held that failure to give the defendant a *Miranda* warning violated his due process rights and his statements were correctly ruled inadmissible.

As a correctional facility, Labette is governed by the Kansas Administrative Regulations concerning the Department of Corrections. K.A.R. 44-1-101 *et seq.* When an inmate violates a criminal law, the crime must be reported "to the appropriate law enforcement or prosecutorial agency." K.A.R. 44-13-101(f). See K.A.R. 44-13-103.

Consequently, because Qualls and Whorten were required to report any criminal law violations by an inmate to the appropriate law enforcement or prosecutorial agency, they were not acting as private citizens but were acting as law enforcement agents.

## WAS BENOIT IN CUSTODY WHEN THE QUESTIONINGS OCCURRED?

Next, we must determine if Qualls' and Whorten's questionings of Benoit were custodial interrogations, because *Miranda* does not apply to general on-the-scene questioning. The *Miranda* Court stated: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477.

The "on-the-scene questioning" exception found in *Miranda* has also been applied to prison situations. In *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978), the court held that a conversation between a guard and an inmate, arising during a routine search in which marijuana was discovered, was admissible absent *Miranda* warnings. Upon discovering the substance, a sheriff's deputy and a shift commander took the box containing the substance and questioned the inmate who sat in the prison library awaiting his transfer to another cell. 589 F.2d at 426-27. The court concluded that the sheriff deputy's "questioning was not an instance of custodial interrogation. . . . Rather, this was an instance of on-the-scene questioning enabling [the deputy] to determine whether a crime was in progress." 589 F.2d at 429.

The *Cervantes* court examined the United States Supreme Court decision of *Mathis v. United States*, 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968), which created a *per se* rule for a *Miranda* warning when questioning prison inmates. The court in *Cervantes* stated:

"To interpret *Mathis* as [the defendant] urges would, in effect, create a per se rule that any investigatory questioning inside a prison requires *Miranda* warnings. Such a rule could totally disrupt prison administration. Miranda certainly does not dictate such a consequence. . . .

"Adoption of [the defendant's] contention would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe the Supreme Court intended such a result. Thus, while *Mathis* may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in *Mathis* no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prison status." 589 F.2d at 427.

Consequently, to create a custodial interrogation in a prison setting, some courts look to an additional requirement, such as changes in the surroundings of the prisoner that result in an added imposition or restriction on the inmate's freedom of movement. *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985); *United States v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986). Other courts approve the view that an inmate is not *ipso facto* "in custody" under *Mathis*. See *Flittie v. Solem*, 751 F.2d 967, 974 (8th Cir. 1985); *United States v. Scalf*, 725 F.2d 1272, 1275 (10th Cir. 1984).

However, in employing this test, a court must still examine the totality of the circumstances of the interrogation. For example, the Eleventh Circuit Court of Appeals stated: "To determine whether prison officials have applied an additional restraint, further restricting an inmate's freedom and triggering *Miranda* warnings, courts must consider the totality of the circumstances surrounding the alleged interrogation." *Garcia v. Singletary*, 13 F.3d 1487, 1492 (11th Cir. 1994).

Once the inmate is considered to be "in custody," the questions asked must be "likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner." *U.S. v. Morales*, 834 F.2d 35 (2nd Cir. 1987) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 64 L.

Ed. 2d 297, 100 S. Ct. 1682 [1980], and *Miranda*, 384 U.S. at 457-58.)

Although the State concedes that Qualls' questioning of Benoit occurred while he was in custody, we cannot agree with that conclusion. For example, Qualls' questioning of Benoit was more an on-the-scene questioning than a custodial interrogation. Qualls' questioning of Benoit occurred at the scene. Moreover, the questioning took place where the surroundings were familiar to Benoit. Finally, the questioning was very brief. Because Qualls' questioning of Benoit was not a custodial interrogation, Benoit was not entitled to a *Miranda* warning. Consequently, the trial court properly allowed Benoit's statements to Qualls to be admitted into evidence.

To the contrary, Whorten's questioning of Benoit was a custodial interrogation. Benoit was removed from the familiar surroundings of Labette to the Labette County jail, where his freedom of movement was greatly restricted. The questioning of Benoit about his alleged escape attempt occurred two days after the incident. The questioning occurred at the jail. And the investigation was underway when Benoit made the incriminating statements to Whorten. Because Whorten was a law enforcement agent and Benoit was in custody, Benoit was entitled to a *Miranda* warning before being questioned by Whorten about his alleged escape attempt.

## WAS THE FAILURE TO FURNISH A *MIRANDA* WARNING TO BENOIT HARMLESS ERROR?

Next, we must consider whether the erroneous admission of Benoit's confession to Whorten is harmless. To find such an error harmless, we must find beyond a reasonable doubt that the error did not contribute to the verdict. *State v. William*, 248 Kan. 389, 414, 807 P.2d 1292 (1991). We cannot make such a finding in this case. Without Benoit's confession to Whorten, the jury would have been left with Benoit's confession to Qualls. The jury had two conflicting accounts of the incident. On one hand, Benoit testified that he was merely looking out the window to alleviate tension and was not trying to escape. On the other hand, the correctional officers testified that, from a distance, they observed Benoit trying to open the door with his identification badge. Given such conflicting tes-

timony, Benoit's confession to Whorten, the administrator of La-bette, two days after the alleged escape attempt probably influenced the jury's verdict. Accordingly, we reverse and remand this case for a new trial.

Because we are reversing and remanding this case for a new trial, we believe it is necessary for us to rule on several other questions presented in Benoit's appeal. Benoit argues in the alternative that if either of his confessions is allowed into evidence absent *Miranda* warnings, the court erred in granting the State's motion in limine excluding any evidence of the lack of *Miranda* warnings. He claims the trial court's exclusion of such evidence precluded him from presenting a complete defense. On the other hand, the State argues that the admissibility of a confession is a question of law for the trial court to determine and that the trial court properly granted its motion in limine.

In an escape from custody case involving a motion in limine, our Supreme Court explained that the hurdle a defendant must clear "is whether the trial court abused its discretion by granting the State's motion in limine, thereby denying [the defendant] a chance to present [a] defense." *State v. Irons*, 250 Kan. 302, 305, 827 P.2d 722 (1992).

Moreover, the trial court's exercise of discretion which results in an error of constitutional magnitude is serious and may not be held to be harmless unless the court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before an appellate court may declare the error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *Saucedo v. Winger*, 252 Kan. 718, 732, 850 P.2d 908 (1993). "Where evidence of guilt is of such direct and overwhelming nature that it can be said that the erroneous admission of certain evidence could not have affected the result of the trial, such admission is harmless error." *State v. Juarez*, 19 Kan. App. 2d 37, 41, 861 P.2d 1382 (1993), (quoting *State v. Thompson*, 221 Kan. 176, 183, 558 P.2d 93 [1976]).

Finally, the exclusion of evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right

to a fair trial. *State v. Bradley*, 223 Kan. 710, Syl. ¶ 2, 576 P.2d 647 (1978). Few rights are more fundamental than that of an accused to present witnesses in his or her own defense. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 [1973]). But the right to present a defense is subject to statutory rules and case law interpretation of rules of evidence and procedure. *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993).

For instance, once a trial judge has determined that a confession is admissible, the jury may only review the circumstances surrounding the confession in determining what weight to give the confession. According to K.S.A. 22-3215(5), "[t]he issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission."

Benoit relies on *State v. Bradley*, 223 Kan. 710, to justify his right to present a defense. In *Bradley*, the court held: "It is fundamental to a fair trial to allow the accused to present his version of the events so that the jury may properly weigh the evidence and reach its verdict. The right to present one's theory of defense is absolute." 223 Kan. at 714. Benoit also cites *Crane v. Kentucky*, 476 U.S. 683, 90 L. Ed 2d 636, 106 S. Ct. 2142 (1986), which essentially reiterates Kansas law, K.S.A. 22-3215(5), that a defendant can introduce evidence regarding the circumstances surrounding a confession.

The State contends that because Benoit was able to show the circumstances surrounding his confessions before the jury, he was not precluded from presenting a complete defense. For example, when Whorten was cross-examined, defense counsel asked him: (1) who was present during the confession; (2) where the confession occurred; (3) whether the confession was in a small room, large room, cell, outside, inside; and (4) whether Whorten intimidated or browbeat Benoit. Defense counsel also examined the circumstances surrounding the confession to Qualls. Defense counsel questioned Qualls on the lighting in the barracks and how many

people were in the barracks that night. Qualls testified on direct examination as to how he questioned Benoit during the confession.

If Benoit's theory of defense is that he was merely looking out the window in the barracks and was not attempting to escape, he was allowed to present this evidence when he took the stand and testified. Consequently, the trial court's granting of the State's motion in limine did not frustrate his defense. On the other hand, if Benoit confessed only to get a second chance and he would not have confessed otherwise, this kind of evidence bears directly upon whether Benoit's confessions were voluntary. See *State v. Johnson*, 253 Kan. 75, 83, 853 P.2d 34 (1993). Because the voluntariness of Benoit's confessions was within the sole domain of the trial court, the trial court did not abuse its discretion in granting the State's motion in limine.

Benoit next argues his intake sheet from Labette could not be used as evidence because it contained an admission to another crime—his regular use of marijuana. Benoit contends that the prejudicial effect of the admission is far greater than any probative value of the intake sheet. Further, Benoit contends that the State already had three known handwriting documents from him and the admission of his intake sheet was cumulative, thus decreasing its probative value.

"Relevant evidence is evidence 'having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). The admissibility of evidence rests largely within the sound discretion of the trial court." *State v. Tran*, 252 Kan. 494, Syl. ¶ 5, 847 P.2d 680 (1993). No evidence of prior crimes or civil wrongs may be admitted unless it is relevant to one or more of the material facts set out in the statute. K.S.A. 60-455. Here, the intake sheet was not admitted to prove any of the factors under this section. Instead, the intake sheet was admitted as a known handwriting sample of Benoit. And because that sample was used to show Benoit wrote certain letters discussing his intent to escape, the intake sheet was relevant evidence.

The trial court has discretion to exclude even relevant evidence. For example, K.S.A. 60-445 states: "Except as in this article otherwise provided, the judge may in his or her discretion exclude

evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

Although the statute specifically refers to the element of surprise, the trial court may exclude any evidence that may unfairly prejudice the jury. Moreover, when the question arises as to whether the evidence is unfairly prejudicial, the trial court has an obligation to weigh the probative value of the evidence. See *State v. Davis*, 213 Kan. 54, 59, 515 P.2d 802 (1973). In *Davis*, the defendant faced charges of selling heroin. Our Supreme Court held that it was reversible error for the trial court to allow an informant to testify that defendant had sold him heroin on two previous occasions which were unrelated to the current charges against defendant. The court ruled such testimony caused undue and unfair prejudice.

Here, the State introduced three other documents containing samples of Benoit's known handwriting. The State has not contested this fact. Undoubtedly, these three additional known handwriting samples of Benoit were sufficient for comparison purposes concerning the letters. Consequently, the intake sheet was cumulative.

The State argues the trial court gave a jury instruction that eliminated any prejudicial effect of Benoit's admission of marijuana use. Consequently, we must determine if the jury instruction cured the prejudicial effect of Benoit's illegal drug use. Benoit contends that the instruction only pertained to evidence of Benoit's conviction of burglary and theft and not his use of marijuana. The State argues there is nothing in the record that limits the applicability of the instruction as Benoit suggests and it could apply to other criminal offenses as well.

The first sentence of this jury instruction does not appear to be limited in any manner. It provides: "Evidence has been admitted tending to prove that the defendant committed a crime other than the present crime charged." But, the second part of the instruction reads: "This evidence may be considered solely for the purpose of proving a necessary element of the offense, that element being that

the defendant was being held in lawful custody at the time of commission of this offense." The instruction seems to be expressly limited to the crimes causing his present confinement; that is, burglary and theft. Consequently, the instruction failed to cure the prejudicial effect of Benoit's admission of marijuana use. Because the prejudicial effect of the intake sheet outweighed its probative value, we conclude the trial court should have excluded the intake sheet as evidence in this case.

Having reversed and remanded this case for a new trial, we believe it is unnecessary for us to rule on whether the trial court erred in permitting the State's late endorsement of a witness.

Affirmed in part, reversed in part, and remanded.