(915 P.2d 169)

No. 72,796

STATE OF KANSAS, *Appellee*, v. MICHAEL GOODEN, *Appellant.*

Opinion filed April 26, 1996.

*Alice Craig* and *Julie A. Gorenc,* assistant appellate defenders, and *Jessica R. Kunen,* chief appellate defender, for appellant.

*Michelle V. Hostetler,* assistant district attorney, *Joan M. Hamilton,* district attorney, and *Carla J. Stovall,* attorney general, for appellee.

Before GERNON, P.J., GREEN, J., and DAVID PRAGER, Chief Justice Retired, assigned.

PRAGER, C.J.: Michael Gooden was convicted by a jury of one count of involuntary manslaughter, K.S.A. 1993 Supp. 21-3404.

Gooden appeals, contending that he was deprived of his Fifth Amendment right against self-incrimination when statements made by him to law enforcement officers, prior to the giving of *Miranda* warnings but after he had been deprived of his freedom in a significant way, were used against him at his trial.

The facts in this case are not greatly in dispute. On November 6, 1993, Gooden, David Richey, and Bryan Perkins were in the kitchen of Gooden's Topeka home. According to Gooden, Richey was playing with a knife, and Gooden was playing with a pistol. Gooden accidently shot and killed Richey. Gooden told Perkins to call for help while he performed CPR on Richey. Perkins called for assistance, and police officers and emergency medical crews arrived at the scene. Officer White of the Topeka Police Department and Gooden proceeded to the living room, where White asked Gooden what happened. Gooden said he was coming downstairs when he heard gunfire. White then talked to Perkins, who said that Richey had been shot outside during a drive-by shooting. White then returned to the living room and asked Gooden for the truth. This time, Gooden said he was in the kitchen when he heard gunfire and that he went outside and helped Perkins carry Richey inside. Because of the chaos and commotion downstairs, White asked Gooden if they could go upstairs, and Gooden agreed.

White and Gooden went to an upstairs bedroom to talk. When White went back downstairs to get a tape recorder, he was informed that blood spatters in the kitchen indicated the shooting occurred in the kitchen. White returned to the bedroom and, without Gooden's knowledge, tape-recorded the interview. Gooden told White that Richey may have been the victim of a gang-related drive-by shooting that was probably intended for Gooden. White told Gooden that no shooting had taken place outside. Gooden said he wanted to go outside and talk. White said, "No." Gooden clarified that he did not intend to run but only wanted to get some fresh air. White said he did not want to talk outside because there were too many people there and that it was too cold. Gooden responded, "That's true." Gooden stood up, and White asked him to sit down.

As White persisted for the truth, Gooden changed his story again. This time, Gooden claimed he was checking on his daughter in the living room when he heard men's voices coming from the kitchen; the men were looking for Gooden, and he then said he heard gunfire. As the interview continued, White insisted Gooden reveal who did the shooting. Gooden then changed his story and said a man named Ronald Bell had accidentally shot Richey while the two men were playing around with a knife and a gun. White testified Gooden agreed to go to the police station and talk with detectives.

The police took Gooden and Perkins to the police station, where a videotaped interrogation took place. Gooden told them that Ronald Bell had accidently shot Richey. Most of the questions were directed toward the identification and location of Bell, and Gooden was shown photographs in an attempt to identify Bell. The detectives never told Gooden that he was a suspect or that he was in custody or under arrest. They never said he could not leave. They never raised their voices, swore, or threatened Gooden in any way. Gooden never indicated any unwillingness to answer questions.

The detectives then interviewed Perkins, who changed his story and said that Gooden had accidentally shot Richey. At this point, the detectives brought Gooden back into the interrogation room and immediately informed him of his *Miranda* rights. Gooden acknowledged those rights and voluntarily waived them. Gooden then admitted he was the person who shot Richey.

The sole issue raised on appeal is whether Gooden was deprived of his Fifth Amendment right against self-incrimination when the statements made by him to the law enforcement officers prior to the giving of *Miranda* warnings were used against him at the trial.

When challenging a trial court's decision which refuses to suppress statements for violation of a defendant's *Miranda* rights, the standard of review is whether the trial court's decision is supported by substantial evidence. If so, an appellate court will not substitute its view of the evidence for that of the trial court. *State v. Fritschen*, 247 Kan. 592, 597, 802 P.2d 558 (1990). Substantial evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reason-

ably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *State v. Grissom*, 251 Kan. 851, 907, 840 P.2d 1142 (1992).

The resolution of this issue requires consideration of Officer White's questioning of Gooden at the scene of the shooting, Gooden's home, and Detectives Young and Wywadis' questioning at the police station, and whether such questioning was custodial in nature. In *Miranda v. Arizona*, 384 U.S. 436, 478, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), the United States Supreme Court held that when an individual is taken into custody or otherwise deprived of his or her freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is seriously jeopardized. The *Miranda* decision recognizes that general on-the-scene questioning of citizens in the fact-finding process does not constitute custodial interrogation requiring advice of rights. 384 U.S. at 477.

In this case, it is undisputed that White did not inform Gooden of his *Miranda* rights before questioning him at the scene of the crime. Thus, the basic issue is whether White subjected Gooden to a custodial interrogation. If the questioning was custodial, the district court erred in admitting Gooden's statements at the trial.

"Custodial interrogation" is defined as " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Benoit*, 21 Kan. App. 2d 184, 189, 898 P.2d 653 (1995) (quoting *Miranda v. Arizona*, 384 U.S. at 444). In contrast, an investigatory interrogation is the questioning of a person by a law enforcement officer in a routine manner in an investigation that has not reached the accusatory stage and where such person is not in legal custody or deprived of his or her freedom in any significant way. *State v. Jones*, 246 Kan. 214, 216, 787 P.2d 726 (1990). The Supreme Court made it clear in *Miranda* that the decision was "not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general ques-

tioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477.

In *State v. Carson*, 216 Kan. 711, 715, 533 P.2d 1342 (1975), the Kansas Supreme Court outlined five factors that a court may consider in deciding whether a particular interrogation is custodial: (1) the nature of the interrogator; (2) the nature of the suspect; (3) the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress of the interrogation. The court, however, later disapproved the second factor because of its subjective nature. *State v. Fritschen*, 247 Kan. at 601-03. It is also noted that a trial court is not required to follow any hard and fast factors; the importance of each factor varies among the differing cases. 247 Kan. at 603. These principles were applied in *State v. Benoit*, 21 Kan. App. 2d at 196.

In the case before us, Gooden contends that White's questioning of him in the upstairs bedroom constituted a custodial interrogation. In determining the validity of this contention, we should consider the relevant factors set forth in *State v. Carson*, 216 Kan. at 715. First, White was a uniformed officer who responded to Perkins' call for assistance at the scene of the shooting. There was no evidence that White was an interrogation specialist dispatched to the scene in order to elicit a confession from Gooden. Instead, the evidence is clear that White was engaged in a general on-the-scene questioning as to the facts surrounding the shooting of Richey. He interviewed Gooden as a person who was on the premises when the shooting occurred. At that point, Gooden was being questioned in the fact-finding process.

The time and place of the questioning are important. It occurred immediately after the shooting in Gooden's own house. The surroundings were familiar to Gooden. The fact that much of the interview occurred in an upstairs bedroom is not important. There is no evidence that the bedroom door was locked or even closed. They went upstairs to avoid the commotion in the kitchen area.

The nature of the investigation is very important. The undisputed evidence showed that the questioning was part of an on-the-scene investigation into the facts of the crime. Gooden's interview lasted approximately 30 minutes, and White was concerned with

obtaining a truthful account of what Gooden witnessed. It is true that at one point Gooden stood up and reached into a closet. White apparently pulled out his gun and told Gooden to sit down. White told Gooden to sit down because he was making him nervous. White then went out and retrieved a cigarette for Gooden. Otherwise, there was no evidence presented that White raised his voice at, swore at, or threatened Gooden. White never told Gooden he was a suspect, that he was in custody, or that he was under arrest. Gooden never told White that he did not want to talk. The fact that White tape-recorded the interview without Gooden's knowledge is irrelevant.

The final factor is the nature of the investigation at the time of the questioning. The police knew that Gooden had lied when he said the shooting occurred outside the house. However, there was no indication that it was Gooden who had fired the gun. The investigation had not reached an accusatory stage.

We have considered the evidentiary record and have concluded that there was substantial competent evidence to support the trial court's decision that the interrogation of Gooden by White at the scene of the shooting was not a custodial interrogation and, therefore, Gooden was not deprived of his Fifth Amendment right against self-incrimination at the scene of the shooting.

Gooden also contends that the pre-*Miranda* questioning by Detectives Wywadis and Young at the police station constituted a custodial interrogation. Again, the proper test is whether a reasonable person in the suspect's position would have believed that he or she was in custody.

White testified that Gooden agreed to go to the police station to talk to detectives. At the station, Wywadis and Young conducted the videotaped interrogation. At the beginning, Gooden asked if he could go home because he was tired. Young told him there was no problem with that and they just needed to talk and see what he remembered had happened. Gooden said, "All right," and "Okay, that's fine." Young said, "You have any problem with that?" Gooden replied, "No." The detectives never told Gooden he was a suspect or that he was in custody or under arrest. They never said he could not leave. They never raised their voices at, swore at,

or threatened Gooden in any way. Gooden never indicated an unwillingness to answer questions. The focus of the interrogation was identifying and locating Ronald Bell, who Gooden had stated was the person who had accidentally shot Richey while the two men were playing around with a knife and gun. The detectives had Gooden examine photographs to see if he could identify Bell.

Next, the detectives interviewed Perkins, who finally told the truth and told them that Gooden had accidentally shot Richey. At that point, Gooden became the prime suspect, and the case had reached the accusatory stage. The detectives brought Gooden back into the interrogation room and immediately informed him of his *Miranda* rights. Gooden then acknowledged those rights, voluntarily waived them, and then confessed to being the person who shot Richey. At the trial, Gooden testified that he had unintentionally shot Richey.

In view of this evidence, we hold that the trial court did not commit error in overruling Gooden's objection to the admission of his statements made at the interrogation at the police station.

We further hold that even if the trial court erred in holding the interrogation was not custodial in nature, any error in admitting the statements is harmless. Prior to receiving the *Miranda* warnings, Gooden did not confess to committing the crime. He only confessed to the crime after he had been advised of and had voluntarily waived his *Miranda* rights. Thus, the only potentially excludable statements were the several false versions of events given by Gooden. At the trial, Gooden testified that he had unintentionally shot Richey in the kitchen. Gooden was convicted of involuntary manslaughter. To prove that crime, the prosecution had to prove that Gooden unintentionally killed Richey in a reckless manner. Gooden's recklessness stemmed from his waving a loaded gun in Richey's face. If the district court erred, the error was harmless.

Affirmed.