No. 81,289

STATE OF KANSAS, *Appellant,* v. CUONG DANG, *Appellee.*

(978 P.2d 277)

Opinion filed April 16, 1999.

*Joe E. Lee,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellant.

*Lindsey P. Erickson,* of Cornwell & Erickson, of Overland Park, argued the cause, and *Carl E. Cornwell,* of the same firm, was with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by the State from the district court's order granting defendant Cuong Dang's motion to suppress his statement. K.S.A. 22-3603. The State also appeals the district court's granting defendant's motion to dismiss the charges against him, one count each of second- and first-degree murder. K.S.A. 22-3602(b)(1).

On July 15, 1997, a Kansas Department of Transportation employee found human remains wrapped in linens approximately 30 feet from a roadway in Osage County while mowing high grass. There were two bundles of remains approximately 9 feet apart. The grass beneath the wrapped remains was dead or dying as if it had been covered for quite some time.

The skeletal remains were identified as those of an oriental female believed to be between the ages of 28 and 35 and an oriental child between the ages of 2 and 4. Hong Anh Bui and her son, Hector Bui, who had lived at 418 La Jara in Emporia, had been reported missing. Linens matching those in which the bodies were wrapped were found in a search of Hong Anh Bui's trailer. The trailer was locked, and there were no signs of forced entry. The woman who lived at 421 La Jara testified that defendant lived with Hong Bui and her child in June 1997. Defendant moved to Virginia on approximately July 8, 1997.

The pathologist who examined the remains was able to rule out some possible causes of death—blunt-force injury to the chest or head, gunshot wound to the head or chest, or automobile accident. He was not able to determine how the woman and child died. He was not able to tell when they died.

In April 1997 Hong Bui, accompanied by defendant, visited the International Business Service in Wichita for the purpose of securing a permit for reentering Vietnam. Several weeks later, defendant returned in order to obtain a record showing that he was not married. Hong Bui visited the business two more times—once accompanied by defendant for papers for Hector, and another time by herself to submit pictures for her application. The last time was close to May 23, 1997. Sometime later, in either June or July, defendant again visited the business to pick up his document. He asked the proprietor if Hong Bui had paid a deposit for her travel ticket, and he told her that Hong and Hector Bui had died the day before in an automobile accident in Emporia.

We first consider if the trial court properly suppressed defendant's statement. The State cites *State v. DeMarco*, 263 Kan. 727, Syl. 1, 952 P.2d 1276 (1998), and *State v. Webber*, 260 Kan. 263, Syl. 3, 918 P.2d 609 (1996), *cert. denied* 136 L. Ed. 2d 711 (1997), for a dual standard of review. The factual basis for suppression of the evidence is reviewed for substantial competent evidence. The legal conclusion drawn from those facts is subject to a de novo review. Defendant characterizes the issue as one of admissibility of evidence and cites *State v. Green*, 232 Kan. 116, 122, 652 P.2d 697 (1982), for application of an abuse of discretion standard of

review. The question in *Green* was admissibility of evidence of earlier marital conflict in the husband's trial for murder of his wife. *Green* is not applicable. The cases cited by the State involve suppression of statements, as in the present case, and properly govern the standard of review to be applied here.

The trial court's journal entry states that defendant's motion to suppress was granted and incorporates the "specific findings of fact and legal reasoning" as stated on the record at the hearing on motions. The trial judge made the following findings:

Before defendant was questioned, he was the prime suspect in the killing of Hong Anh Bui and her child, Hector Bui.

Kansas law enforcement officers traveled to Virginia for the purpose of questioning defendant.

Using a ruse to gain defendant's consent, cooperating Virginia officers picked up defendant and transported him to a police station where he was turned over to Kansas officers in a windowless interrogation room.

Defendant was not handcuffed. He was not told that he was under arrest.

The Kansas officers questioned defendant for approximately 30 minutes to an hour before they gave him *Miranda* warnings.

During the time before he was given the *Miranda* warnings, defendant was asked questions that focused on his presence in Virginia, about his leaving Kansas, his prior residence in Kansas, his living with Hong Anh Bui, who else he lived with, "and a number of circumstances."

The officers administered the *Miranda* warnings to defendant when they determined "that they were not getting accurate or truthful responses to their questions."

Defendant was questioned for an additional 4 to 4½ hours.

Twice defendant said, "That's it." Once it meant that he had no more to say about the subject of the pending question. The second time it "was a communication by the defendant of his intent or desire to terminate the matter at that time."

Defendant requested permission to leave, but permission was not granted.

Defendant never asked to have counsel present.

The trial court concluded that:

The questioning of defendant was a custodial interrogation.

Defendant should have been advised of his *Miranda* rights at the time he was taken into custody rather than when "the officers decided that they were getting impeaching statements from him."

Statements made after defendant received the *Miranda* warnings "were the direct result of the statements obtained prior to" his being advised of his rights.

Thus, all statements made by defendant during the interrogation should be suppressed.

On appeal, the State concedes that defendant underwent custodial interrogation. The State's principal contention is that there is nothing about the prewarning questioning that requires suppression of the post-warning statements. With regard to the questions asked before defendant was advised of his rights, the State asserts that the officers were asking for basic background information and evaluating defendant's ability to communicate in English in the interlude before the interpreter arrived. This assertion is in contrast to the trial court's findings that before he was advised of his rights, defendant was questioned for 30 minutes to an hour about his being in Virginia; his leaving Kansas; where he lived in Kansas and whom he lived with, including the victim; "and a number of circumstances." The issue for this court is whether the law enforcement officers' failure to administer *Miranda* warnings before beginning the custodial interrogation renders all of defendant's responses inadmissible or whether only the responses he gave prior to the warnings are inadmissible.

Examination of the testimony of the two officers who interrogated defendant bears out the district court's factual findings. When Virginia law enforcement agencies located defendant for Kansas authorities, Detective Sergeant Dennis Delmott and KBI Special Agent Joaquin Padilla went there to question defendant as part of the homicide investigation. They had information about defendant before they began talking to him. They knew that the

female victim, Hong Bui, had a male roommate named Cuong Dang and that Dang told someone in Wichita that Bui had been killed in a car accident. They also knew that linens in which the bodies were wrapped matched linens from Bui's home.

Thirty-five minutes elapsed between the time the questioning began at 7:20 p.m. and when defendant's waiver of the *Miranda* rights was signed. KBI Special Agent Padilla questioned defendant on the following subjects before he was advised of his *Miranda* rights:

date and place of birth
age when he arrived in the United States
whom he came with
education
criminal record
health and medications
marital status
children
understanding of criminal justice system
current address
employment
work experience
specifics about the job he held in Emporia
why he left that job
when he arrived in Virginia and where he stayed
whether he currently had a girlfriend
whether he had a girlfriend in Emporia
his last address in Emporia, whom he lived with, whether he owned or rented

In response to questions about his living situation in Emporia, defendant said that he had lived alone in a mobile home at 418 La Jara for about 6 months. According to Padilla, "at this time I told him that . . . before we went on we wanted to . . . read him his rights."

Delmott testified that defendant was questioned about his relationship with Hong Bui before he was advised of his rights. He testified that defendant "was caught in several lies, and at that point we believed if a person was lying that he was obviously trying to

hide something, so the *Miranda* warning was given." He identified the prewarning lies as the following: "That he had never met Ms. Bui; that he had never gone to Dodge City with her; that he had never gone to Wichita with her." It is obvious that the questioning went well beyond administrative or background before the officers informed defendant of his *Miranda* rights.

In support of its argument, the State cited *State v. Gooden*, 22 Kan. App. 2d 271, 915 P.2d 169, *rev. denied* 260 Kan. 998 (1996). *Gooden* does not involve a custodial interrogation. The question in *Gooden* was the propriety of on-the-scene statements made by the defendant to law enforcement officers prior to the giving of *Miranda* warnings being used against him at the trial. The trial court determined that the on-the-scene questioning of Gooden was not a custodial interrogation, and the Court of Appeals found substantial competent evidence to support the trial court's determination. The State would have this court note the Court of Appeals' additional holding:

"We further hold that *even if the trial court erred in holding the interrogation was not custodial in nature,* any error in admitting the statements is harmless. Prior to receiving the *Miranda* warnings, Gooden did not confess to committing the crime. He only confessed to the crime after he had been advised of and had voluntarily waived his *Miranda* rights. Thus, the only potentially excludable statements were the several false versions of events given by Gooden. At the trial, Gooden testified that he had unintentionally shot Richey in the kitchen. Gooden was convicted of involuntary manslaughter. To prove that crime, the prosecution had to prove that Gooden unintentionally killed Richey in a reckless manner. Gooden's recklessness stemmed from his waving a loaded gun in Richey's face. If the district court erred, the error was harmless." (Emphasis added.) 22 Kan. App. 2d at 277.

The State notes that the present case is similar to *Gooden* in that only false versions of events were given by the defendant before he was advised of his rights.

*Gooden* is not on point. The sole issue in *Gooden* was whether defendant "was deprived of his Fifth Amendment right against self-incrimination when the [non-custodial] statements made by him to the law enforcement officers *prior* to the giving of *Miranda* warnings were used against him at the trial." (Emphasis added.) 22 Kan.

App. 2d at 273. The post-warning statements were not at issue, and the prewarning statements were admitted, not excluded.

Gooden was not in custody when he made his prewarning statements; defendant in the present case was in custody. *Miranda* warnings are not required for noncustodial questioning; they are required for custodial questioning. Gooden's prewarning statements were admissible because they were in response to noncustodial questioning, and, even if the questioning was custodial, the statements were not probative. Gooden's incriminating, post-warning statements were not at issue. In contrast, the admissibility of defendant Dang's post-warning statement is the central issue.

Defendant relies on *State v. Lewis*, 258 Kan. 24, 899 P.2d 1027 (1995). Not long after a fatal shooting, police apprehended Lewis near the scene wearing bloodstained pants. Approximately 3 hours later, Lewis was interviewed at police headquarters. He refused to talk, but the detectives persisted. After some heated, foul exchanges with the defendant, one of the officers "told Lewis to '[e]xercise your right; zip it, clip it.'" 258 Kan. at 26. Then, while Lewis was being booked into jail, another officer told him to give the police his side of the story before getting an attorney. Lewis was transported to the jail and allowed to sleep and eat. When Lewis had been in custody approximately 10 hours, he was returned to police headquarters for questioning. With some prompting, Lewis confessed to shooting the victim. Then he was advised of his *Miranda* rights, and he reiterated his confession. The trial court admitted the videotape of the entire interview that occurred when Lewis was returned to police headquarters after sleeping and eating, and the Court of Appeals affirmed in an unpublished decision. This court reversed and remanded for a new trial. It noted with disapproval that at the second interview, the police "continued the use of improper tactics to overcome Lewis' resistance to talk and obtain an incriminating statement from Lewis." 258 Kan. at 37. The interrogating officer "deliberately failed to warn Lewis of his *Miranda* rights" until after the incriminating statement had been obtained from him. 258 Kan. at 37.

In analyzing the circumstances in *Lewis*, the court started from the premise that "[t]he failure of the officers to administer the

*Miranda* warnings to Lewis created the presumption of compulsion." 258 Kan. at 37. The court then examined the circumstances to determine whether the State had overcome the presumption of compulsion. It found that the State had not overcome the presumption and, in addition, that "the police used deliberately coercive and improper tactics in violation of the Fifth Amendment to obtain Lewis' *initial* incriminating statement." (Emphasis added.) 258 Kan. at 37. "When the police fail to warn a person in custody of the right to remain silent and use deliberately coercive and/or improper tactics in obtaining an incriminating statement, the privilege against self-incrimination is violated and the statement cannot be used as evidence against the individual." 258 Kan. at 37.

In the present case, the officers' failure to administer the *Miranda* warnings to defendant prior to his custodial interrogation created the presumption of compulsion as to the initial statement made by defendant, and consequently those initial statements were not admissible. Those statements are not at issue; only the post-warning statements were admitted. Absent coercion or improper tactics by the officers in obtaining the initial statements, there is no presumption of compulsion as to the subsequent post-*Miranda* statements.

The trial court found that defendant's post-*Miranda* statements were voluntary, but nonetheless concluded that the post-warning statements should be suppressed because they "were the direct result of the statements obtained prior to" the warnings.

In *Oregon v. Elstad,* 470 U.S. 298, 305-09, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), the United States Supreme Court held that a noncoercive *Miranda* violation did not automatically taint post-*Miranda* statements. Elstad was arrested at his home. The arresting officer testified:

" 'I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, "Yes, I was there." ' " 470 U.S. at 301.

Elstad was then taken to police headquarters where 1 hour later he was advised for the first time of his *Miranda* rights and gave a full statement. The Court, in finding Elstad's statement was admissible, stated:

"Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

. . . .

". . . We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." 470 U.S. at 309, 314.

In the present case, the trial court concluded that the *Miranda* violation necessitated suppressing the statements made by defendant after, as well as before, he had been advised of his rights. Considering circumstances comparable to those in the present case, a federal district court stated:

"Because *Miranda* procedural violations are only presumptively coercive but not actually coercive, they do not trigger the 'fruit of the poisonous tree' doctrine or the 'cat out of the bag' analogy. *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989). Put another way, '[w]here the uncounseled statement is voluntary, and thus not a product of "inherently coercive police tactics or methods offensive to due process," *id*. [*Elstad*], 470 U.S. at 317, 105 S. Ct. at 1297, there is no fifth amendment violation and the "fruits" may be admissible in the Government's case in chief.' *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1517 (6th Cir. 1988) (citations omitted). The Tenth Circuit recently discussed the *Elstad* holding in these terms:

'*Elstad* "makes clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled statement." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1517 (6th Cir. 1988). "Where the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process' . . . there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case in chief." *Id*. Similarly, under *Elstad*, "[i]f the unwarned statement was voluntary, and the allegedly tainted second statement was also voluntary, the second warned statement is admissible" since "[t]he Fifth Amend-

ment . . . prohibits only the use of compelled testimony." *United States v. Wiley*, 997 F.2d 378, 383 (8th Cir.), *cert. denied* 510 U.S. 1011, 114 S. Ct. 600, 126 L. Ed. 2d 565 (1993).'

*United States v. McCurdy*, 40 F.3d 1111, 1117 (10th Cir. 1994)." *U.S. v. Singleton*, 922 F. Supp. 1522, 1530-31 (D. Kan. 1996).

Defendant concedes that the officers who interrogated him were not verbally abusive like the detective who questioned Lewis. He contends, however, that other coercive tactics were used against him. He complains of being transported to the police station at 7:20 in the evening, not having a vehicle at the station, and being in a small windowless room with his back to the door. He complains that the interview was in English, lasted 5 hours, and was not stopped when he said, "That's it." The only one of these complaints that deserves examination is defendant's saying, "That's it." As the trial court concluded, there is nothing about the time, length, or physical setting that offends principles of fairness or due process. Language is not an issue because an interpreter was provided and excused when her services were found to be unnecessary. With regard to the second time defendant said, "That's it," the trial court concluded that defendant was communicating his desire to end the questioning. The trial court considered the statement to be an earmark of a custodial, as opposed to a noncustodial, interrogation, but not as a factor indicating that the post-*Miranda* statements were involuntary. In other words, the trial court did not consider defendant's words to be an attempt to exercise his right to remain silent. Defendant included his words in his list of allegedly coercive tactics for the purpose of demonstrating that the whole of his post-*Miranda* statements was involuntary. He does not seem to seriously contend, however, that the questioning was continued over his objection. If that were his contention, he might have been expected to distinguish between the statements given before and after he said, "That's it," for the purpose of establishing that the latter were involuntary. He did not, however, draw that distinction.

In this case, the trial court mistakenly applied the "fruit of the poisonous tree" principle or something closely akin to it to defendant's post-*Miranda* statements. The trial court found that the post-warning statements were voluntary, and that appears to be

correct. Because there were no coerced or involuntary statements given by defendant either before or after he was informed of his *Miranda* rights, his post-warning statements are admissible.

The second issue raised by the State is that the trial court erred in dismissing the murder charges against defendant on the ground that the State had not made a prima facie showing of the corpus delicti for homicide. The corpus delicti is the element of the victim's death being due to criminal means. It is independent of the identity of the killer. In *State v. Grissom*, 251 Kan. 851, 879-80, 840 P.2d 1142 (1992), this court stated:

> " 'In homicide cases the corpus delicti is established by proof of two facts: that one person was killed, and that another person killed him. *State v. Pyle*, 216 Kan. 423, 432, 532 P.2d 1309 (1975); *State v. Phippen*, 207 Kan. 224, 229, 485 P.2d 336 (1971); *State v. Doyle*, 201 Kan. 469, 477, 441 P.2d 846 (1968). The corpus delicti may be proved by direct testimony, by indirect or circumstantial evidence, or by a combination of both. *State v. Pyle*, 216 Kan. at 432.' *State v. Henderson*, 226 Kan. 726, 731, 603 P.2d 613 (1979).
> See *State v. Bird*, 240 Kan. 288, 299, 729 P.2d 1136 (1986), *cert. denied* 481 U.S. 1055 (1987); *State v. Yarrington*, 238 Kan. 141, Syl. ¶¶ 6, 7, 708 P.2d 524 (1985).
> 'Circumstantial evidence is evidence that tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue, and therefore affords a basis for a reasonable inference by the jury or court of the occurrence of the fact in issue. [Citation omitted.]' *State v. Flinchpaugh*, 232 Kan. 831, 835, 659 P.2d 208 (1983)."

The State's prima facie showing of corpus delicti must be made independently of admissions or confessions of a defendant. *State v. Pyle*, 216 Kan. 423, 432, 532 P.2d 1309 (1975).

The trial judge was of the opinion that "[t]he State's evidence is absolutely lacking that there was, in fact, a killing." He stated that the coroner's conclusion that the deaths were homicides "was due to the fact of where the bodies were found and that that would not be a place where one would normally expect to find bodies," and "that's not enough to meet the standard."

The trial court ignored other circumstantial evidence in the record tending to show that the victims' deaths resulted from killings rather than from natural causes. It includes the following:

- The victims were a young mother and her small child;

- their bodies were found wrapped in linens that matched linens from their household;
- their bodies were found in a neighboring county in tall weeds and had been there for some time;
- defendant told someone that the victims had died in an automobile accident; and
- the pathologist ruled out the possibility that the victims died in an automobile accident.

KBI Special Agent Padilla best summed it up in his response to defense counsel's question of why he concluded "that those bodies were put there in a dead condition":

"Well, upon observing them in a skeletal remains position, wrapped in bedding, I've never in all the 23 years and 40 some homicides I've worked, or 40 some death investigations, come across anyone that wrapped themselves in blankets in 90 degree heat in July and stayed there, with one of them being wrapped in a comforter, and stay there until they decayed and decomposed."

The simultaneous or near-simultaneous deaths of a young woman and her small child suggests that they did not die from natural causes. The location of the bodies and their being wrapped up tend to eliminate the possibilities of murder/suicide, double suicide, and accident. These facts support the State's theory that the deaths of Hong Anh and Hector Bui were by criminal means. Nothing more than this prima facie showing is necessary to establish the corpus delicti for homicide.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.