(131 P.3d 1253).

No. 93,751

STATE OF KANSAS, *Appellee,* v. IAN WOOLVERTON, *Appellant.*

Opinion filed April 14, 2006.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Phill Kline,* attorney general, for appellee.

Before ELLIOTT, P.J., GREEN and GREENE, JJ.

GREEN, J.: Ian Woolverton appeals from his jury trial convictions of criminal threat in violation of K.S.A. 21-3419 and telephone harassment in violation of K.S.A. 21-4113. First, Woolverton argues that the trial court erred in allowing the State to introduce evidence of his prior conviction for criminal threat. Woolverton

objected to this evidence as being irrelevant. We disagree. More-over, we determine that Woolverton's prior conviction was relevant to show the continued friction and discord between Woolverton and his former girlfriend before the current offenses. In addition, we determine that the discordant relationship evidence was admissible independent of the restrictions of K.S.A. 60-455. There-fore, we find no abuse of discretion in the trial court's admission of this evidence.

Second, Woolverton contends that there was insufficient evidence to convict him of criminal threat because the State failed to prove that the threat occurred in Johnson County. Woolverton maintains that the crime occurred in Missouri because that was his location when he made the alleged threat. We determine that part of Woolverton's crime was committed when he communicated the threat to the victim in Johnson County. Therefore, Woolverton's argument fails. Finally, Woolverton argues that the trial court erred in allowing the State to introduce his statements made to police detectives when he had not been given *Miranda* warnings. Nevertheless, because Woolverton was not in custody when he made those statements, the detectives were not required to give *Miranda* warnings. Woolverton's statements were freely and voluntarily given and were admissible at trial. Accordingly, we affirm.

On the morning of December 26, 2003, Officer Rod Smith was called to Cathy Rotski's home in Johnson County to investigate an incident that occurred between Rotski and Woolverton earlier that morning. Upon arriving at Rotski's home, Smith noticed that Rotski was a little agitated. Rotski told Smith that she had called Woolverton around 10:10 a.m. to inquire about why he had not shown up for his 10 a.m. visitation with their daughter. At the time, Woolverton was living in Missouri with his girlfriend, Melinda Edwards, and Rotski was living in Johnson County, Kansas. Woolverton told Rotski that he was sleeping. When Rotski asked Woolverton whether sleeping or visitation with his daughter was more important, Woolverton became angry. Rotski told Smith that she ended the telephone conversation by telling him not to come over to see his daughter.

After hanging up on Woolverton, Rotski received several more calls from him. Rotski told Smith that Woolverton had cursed, called her names, and threatened her life during the telephone calls. Rotski eventually stopped answering the phone and let Woolverton's calls go to her voicemail. While Smith was at Rotski's house, she called her voicemail and allowed Smith to hear three messages from Woolverton. These messages were later recorded by Detective Luke Roth and placed into evidence at trial. According to Rotski, she received approximately eight calls from Woolverton that morning.

Several days after the incident, Roth and another detective went to see Woolverton at the apartment where he was staying in Kansas City, Missouri. Woolverton told the detectives that when Rotski called him on the morning of December 26, 2003, she was upset and called him names because he had not called his daughter at 10 a.m. Woolverton said that he became angry and left three messages on Rotski's voicemail. Woolverton initially denied making any threats to Rotski and said that he could remember only that he was upset and cursing a lot during the three telephone calls. Nevertheless, Woolverton later admitted that he had told Rotski, "I'll fucking kill you," during one of the calls. Woolverton told the detectives that he had been angry when he made that statement to Rotski, that he was wrong for saying it, and that he would never hurt Rotski or his daughter.

Woolverton was later charged with criminal threat and telephone harassment. At trial, Rotski testified about Woolverton's threat to kill her during the telephone calls on December 26, 2003. According to Rotski, Woolverton became very angry when she told him that he could not see his daughter that day because he had failed to show up at 10 a.m. Woolverton began yelling and cursing at her. After she hung up on him, he called her back and said that he was going to kill her. Rotski testified that she was frightened and hung up on him. According to Rotski, Woolverton called her back and again threatened to kill her. Woolverton told her that she better not go out and that he was going to take their daughter and Rotski would never see her again.

Both Rotski's and Woolverton's testimony indicated that there were ongoing problems between them. According to Rotski, there were previous times when Woolverton would be late for the visits with his daughter and the visits would have to be rescheduled. Woolverton testified that approximately every 3 months, Rotski would stop letting him see his daughter. Moreover, Woolverton indicated that Rotski was calling him between 8 and 10 times a day in 2003. Edwards testified that Woolverton had received at least 30 calls from Rotski in 2003, some of which were angry and threatening.

Woolverton testified that when Rotski called on the morning of December 26, 2003, there had been no agreement for him to visit their daughter that day. Edwards testified that she had previously spoken with Rotski about either Rotski or Woolverton calling on December 26, 2003, to set up a time for their daughter to receive her Christmas gifts. When Rotski called on the morning of December 26, 2003, Edwards answered the phone and she could tell that Rotski was angry. After she handed the phone to Woolverton, Edwards could hear Rotski cursing at Woolverton. Edwards heard Woolverton threaten to kill Rotski during the telephone calls that morning.

Woolverton testified that he became upset with Rotski during their telephone conversation when she called him names and told him that she would take their daughter and run from state to state so that he could never see her again. Woolverton said that he made the three phone calls because he had been abused by Rotski for years. In his trial testimony, Woolverton admitted that he called Rotski names and that he told her he would "fucking kill" her during the phone calls. Woolverton testified that after he made the three phone calls, he felt terrible and wanted to apologize to her. Woolverton further testified that he had no thoughts of hurting Rotski or his daughter.

Woolverton testified that he "stooped to [Rotski's] level" that morning but had never done so before that. Woolverton testified that he had never before threatened Rotski. Nevertheless, the State, over defense counsel's objection, was able to question Wool-

verton about a March 2001 prior conviction where he pled guilty to criminal threat against Rotski.

The jury found Woolverton guilty of criminal threat and telephone harassment.

*Prior Conviction*

First, Woolverton argues that the trial court erred in allowing the State to introduce evidence of his prior conviction for criminal threat. Our standard of review concerning the admission of evidence, subject to exclusionary rules, is abuse of discretion. *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004). "Discretion is abused only where no reasonable person would take the view adopted by the trial court." *State v. Parker*, 277 Kan. 838, 844, 89 P.3d 622 (2004). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *State v. Martis*, 277 Kan. 267, 280, 83 P.3d 1216 (2004).

Before trial, Woolverton moved to prevent the State from mentioning any of his prior arrests or convictions, arguing that they were irrelevant to the State's case. Moreover, Woolverton maintained that any mention of his prior arrests or convictions would be improper and prejudicial to him. After a pretrial hearing, the State indicated that it did not intend to present evidence of Woolverton's prior convictions. Nevertheless, the State indicated that if Woolverton took the stand and put his veracity in issue, he would be questioned about his past crimes of moral turpitude.

At trial, the State introduced evidence of Woolverton's prior conviction for criminal threat during its cross-examination of Woolverton. Just before introducing this evidence, the prosecutor was questioning Woolverton about a statement he made during direct examination:

"[State:] . . . You testified on direct that you never stooped to her level; is that right?"
"[Woolverton]: I did my very best not to.
"[State]: That's not what you said. You said you would never stoop to her level?
"[Woolverton]: If you were listening right beforehand, I admitted I did stoop to her level.
"[The State:] Right. On December 26?
"[Woolverton:] Yes, I did.

"[The State:] How about before that?
"[Woolverton:] Never.
"[The State:] Never?
"[Woolverton:] Never.
"[The State:] Never threatened her?
"[Woolverton:] Never."

The prosecutor then asked that the jury be excused so that he could take up a matter with the trial court. At the bench and outside of the hearing of the jury, the prosecutor requested that he be allowed to introduce evidence of Woolverton's prior conviction:

"[The State:] In 2000, this defendant pled guilty to criminal threats against Cathy Rotski and, Judge, he has just said he has never threatened her, and that is absolutely completely within the purview of me bringing up that conviction.
. . . .
"[Defense counsel:] I would not—I don't agree to bringing that up. *It's not really relevant here.*
"[Trial court:] I'm going to allow it." (Emphasis added.)

Continuing with cross-examination, the State proceeded to ask Woolverton about his prior conviction:

"[The State:] Mr. Woolverton, the last answer you gave me was you would never threaten Cathy Rotski. Sir, I'd like to go ahead and direct you specifically to June 26 of 2000. Were you in a relationship with Cathy Rotski at that time? Yes or no?
"[Woolverton:] Yes, I was.
"[The State:] And sir, on March 30 of 2001, sir — let me back up. On June 30, 2000 were you charged with criminal threat against Cathy Rotski?"

Defense counsel objected to this line of questioning but failed to state any specific grounds:

"[Defense counsel:] *Objection.*
"[Trial court:] Overruled." (Emphasis added.)

The State then elicited testimony from Woolverton that he had pled guilty to criminal threat against Rotski in March 2001.
K.S.A. 60-404 states:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear *the specific ground of objection.*" (Emphasis added.)

Thus, under K.S.A. 60-404, a party must raise a timely and specific objection to the admission of evidence at trial in order to preserve that issue for appeal. See *State v. Flynn*, 274 Kan. 473, 496, 55 P.3d 324 (2002).

At trial, Woolverton objected to the admission of his prior conviction only on the ground of relevancy. Woolverton now argues on appeal that evidence of his prior conviction was inadmissible impeachment evidence. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different objection. *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002). Because Woolverton failed to object to his prior conviction on the ground that it was improper impeachment evidence, we are precluded under K.S.A. 60-404 from considering his argument on appeal.

Now we turn our attention once again to Woolverton's objection at trial. Woolverton objected to the admission of evidence concerning his prior conviction only on the ground of relevancy. Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). "The determination of relevancy is a matter of logic and experience, not a matter of law. [Citation omitted.] Nevertheless, there must be some material or logical connection between collateral facts and the inference or result they are supposed to establish for them to be competent. [Citation omitted.]" *State v. Trammell*, 278 Kan. 265, 282, 92 P.3d 1101 (2004).

In arguing that the trial court properly admitted Woolverton's prior conviction on the ground of relevance, the State cites to *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997). There, our Supreme Court stated that evidence of a discordant relationship between a defendant and a victim is relevant to show the parties' ongoing relationship, a continuing course of conduct, or to corroborate witnesses' testimony regarding the charged act. 261 Kan. at 470. As a result, Woolverton's prior conviction for criminal threat was relevant to show the existence of a continuing course of conduct between Woolverton and Rotski.

In addition, Woolverton argues that evidence of his prior conviction was inadmissible under K.S.A. 60-455. When evidence is

admitted under K.S.A. 60-455, " '[t]he trial court must find that "(1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice." [Citations omitted.]' " *State v. Tolson*, 274 Kan. 558, 563, 56 P.3d 279 (2002) (quoting *State v. Rucker*, 267 Kan. 816, 824, 987 P.2d 1080 [1999]). Because the State never moved to introduce evidence of Woolverton's prior conviction under K.S.A. 60-455, none of the above required findings were made here.

Nevertheless, we determine that evidence of Woolverton's prior conviction was admissible independent of K.S.A. 60-455. Earlier in the trial, the trial court indicated that if the State had filed a K.S.A. 60-455 motion to bring in prior incidents between Woolverton and Rotski, it would have allowed "enough of it in close in time to show that there was a discordant relationship between the parties, not just that day, but a relationship of discord existed between the parties." We agree with the trial court. Here, evidence of Woolverton's prior conviction was relevant to show the discordant relationship that existed between Woolverton and Rotski and was relevant to Woolverton's intent. This discordant relationship evidence was relevant and admissible independent of the restrictions of K.S.A. 60-455. See *Clark*, 261 Kan. at 470. As a result, Woolverton's argument fails.

As an additional note, we believe that the State's utilization of discordant relationship evidence should be done in the State's case in chief or on proper rebuttal when the witness is the defendant in a criminal proceeding. Similarly, K.S.A. 60-455 evidence is not properly presented during cross-examination but rather should be presented in the State's case in chief or on proper rebuttal. See *State v. Synoracki*, 253 Kan. 59, 69, 853 P.2d 24 (1993). Nevertheless, Woolverton's failure to argue at trial that evidence of his prior conviction was improperly introduced by the State during his cross-examination testimony precludes us from considering this issue on appeal.

Woolverton also contends that the admission of his prior conviction was prejudicial. In *Flynn*, 274 Kan. at 496, our Supreme Court recognized: "Where the probative value of evidence is sub-

stantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. [Citation omitted.]" In the instant case, however, Woolverton never objected at trial that even if his prior conviction was relevant, its prejudicial value outweighed its probative value. See K.S.A. 60-403.

In *State v. Cooper*, 252 Kan. 340, 845 P.2d 631 (1993), our Supreme Court declined to address the defendant's argument concerning the prejudicial effect of the admission of evidence when he had objected only on the ground of relevance at trial. There, the defendant was charged with rape and aggravated criminal sodomy. At trial, when the State attempted to introduce the knife found at the scene of the alleged rape, Cooper objected on the ground of relevance. The trial court overruled the objection and allowed admission of the knife into evidence.

On appeal, Cooper relied on K.S.A. 60-445, which states that the trial court may exclude evidence if the probative value is substantially outweighed by the risk that the evidence will unfairly and harmfully surprise a party. Cooper argued that the admission of the knife resulted in jury prejudice and constituted reversible error. Noting that Cooper's objection at trial only concerned the relevance of the knife, our Supreme Court cited to K.S.A. 60-404 and stated that "[t]he specific grounds for an objection must be given at trial to preserve an issue for appeal." 252 Kan. at 349. Our Supreme Court noted that the trial court never had the opportunity to rule on the question of prejudice. Determining that the knife was relevant, our Supreme Court found no abuse of discretion in the trial court's decision to admit the knife into evidence. 252 Kan. at 347-49.

Here, Woolverton is attempting to argue for the first time on appeal that evidence of his prior conviction was prejudicial. As in *Cooper*, the trial court never had an opportunity to rule on the question of prejudice at trial. Therefore, this issue is not properly before us for review. As a result, Woolverton's argument fails.

*Sufficiency of the Evidence*

Second, Woolverton contends that there was insufficient evidence to convict him of criminal threat because the State failed to

prove that the threat occurred in Johnson County. When a defendant challenges the sufficiency of the evidence in a criminal case, our standard of review is whether after reviewing all of the evidence in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005).

In his brief, Woolverton makes the following argument:

"Because the Kansas Courts focus on the maker of the statements, it follows that the crime occurs at the location of the speaker. In this case, it was undisputed that Mr. Woolverton was in Kansas City, Missouri when the statements in question were made. Because it is irrelevant whether Ms. Rotski even heard the statements, it follows that the crime was completed in Missouri. Because the crime did not take place in Johnson County, there was insufficient evidence to sustain Mr. Woolverton's conviction."

Although Woolverton cites two Kansas Supreme Court cases, the circularity of Woolverton's argument can be shown by reconstructing it as follows:

Woolverton maintains that there was insufficient evidence to convict him of criminal threat because the crime was committed in Missouri. (Claim)

Why should we believe that?

Because it was undisputed that Woolverton was in Missouri when the statements were made. (Premise)

Why should we believe that the crime occurs at the location of the speaker?

Because Kansas courts focus on the maker of the statements, it follows that the crime occurs at the location of the speaker.

(Premise)

(Kansas cite does not support this assertion.)

Why should we believe that Kansas courts focus only on the maker of the statements?

Because it is irrelevant whether the victim even heard the statements, it follows that the crime was completed in Missouri.

(Premise)

(Kansas cite does not support this assertion.)

The weakness of Woolverton's argument lies in the fact that the argument or claim has already assumed to be true what is being argued: the crime was completed in Missouri (and thus there was insufficient evidence to convict him of criminal threat in Kansas). The premises (evidence) prove the claim: the crime of criminal threat was committed in Missouri. The claim proves the premises. The premises and the claim actually make the same claim. Consequently, Woolverton's argument proceeds in a circle.

Woolverton cites *State v. Wright*, 259 Kan. 117, 122, 911 P.2d 166 (1996), where the trial court dismissed the charge of criminal threat against Wright. In responding to the State's argument on appeal, Wright argued that the document charging him with criminal threat failed to set forth that he knew his threat would be communicated to the victim. In rejecting Wright's argument, our Supreme Court stated that the criminal threat statute "does not require, as an element of the offense, that the defendant knew his or her threat would be communicated to the person terrorized. It is sufficient if there is an intent to terrorize or an act in reckless disregard of causing such terror." 259 Kan. at 122.

Woolverton also cites *State v. Cope*, 273 Kan. 642, 44 P.3d 1224 (2002). In that case, Cope was charged with criminal threat under K.S.A. 21-3419, based on statements Cope made to coworkers that he was going to blow up the Johnson County courthouse and would use also automatic weaponry to carry out his assault. The jury found Cope guilty of criminal threat on the theory that Cope had threatened to commit violence and had communicated that threat " *'in reckless disregard of the risk of causing* the evacuation of the Johnson County Courthouse.' " 273 Kan. at 645. On appeal to this court, Cope argued that he never intended his statements to be communicated to anyone at the Johnson County courthouse, that no one had been terrorized by his statements, and that the evidence did not support an inference that his statements were made to cause an evacuation of the courthouse. This court determined that there was no evidence that Cope threatened to commit violence in reckless disregard of the risk of causing the evacuation of the court-

house. Determining that there was insufficient evidence to sustain Cope's conviction for criminal threat, this court reversed his conviction. 273 Kan. at 646.

Our Supreme Court reversed this court's decision in *Cope*. In determining that there was sufficient evidence presented to the jury to sustain Cope's conviction of criminal threat, our Supreme Court stated: "Regardless of whether the threat is real or even capable of being carried out, it is the reaction desired by the communicator, or in this case, the communicator's reckless disregard of the possibility of creating that reaction which constitutes the offense." 273 Kan. at 647.

As the State points out, Woolverton interprets *Cope* to mean that the location of the speaker determines where the crime of criminal threat occurs. Nevertheless, the issue in *Cope* was whether there was sufficient evidence to sustain Cope's conviction. Moreover, in *Wright*, the issue was whether the indictment sufficiently set forth the elements of the crime. Neither of these cases addressed whether the crime of criminal threat occurs *only* where it is uttered and not where it is heard. Woolverton acknowledges that no Kansas cases have addressed the issue of whether a threatening statement made outside of Kansas but communicated to someone in Kansas can be said to occur in Kansas.

Under K.S.A. 2005 Supp. 21-3419(a), criminal threat is defined in relevant part as "any threat to: (1) [c]ommit violence communicated with intent to terrorize another . . . ." A threat is "a communicated intent to inflict physical or other harm on any person or on property." K.S.A. 21-3110(24). K.S.A. 21-3104(1)(a) states that a person is subject to prosecution and punishment under Kansas law if "[h]e commits a crime wholly or partly within this state." An act is committed "partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state." K.S.A. 21-3104(2).

Here, Woolverton communicated the threat to commit violence to Rotski in Johnson County, Kansas. Criminal threat under K.S.A. 2005 Supp. 21-3419(a)(1) requires the *communication* of a threat with intent to terrorize another. Part of the crime occurred when Woolverton communicated the threat to Rotski in Johnson County,

Kansas. Moreover, the result of the criminal threat offense occurred when Rotski heard the threat in Johnson County and became upset and called the police. As a result, Woolverton's argument fails.

*Defendant's Statements to Police*

Finally, Woolverton argues that the trial court erred in allowing the State to introduce his statements to police when he had not been *Mirandized.* "In reviewing a trial court decision regarding the suppression of an accused's statements, '[an appellate court reviews] the factual underpinnings of the decision by a substantial competent evidence standard of review and review[s] the ultimate legal decision drawn from those facts de novo with independent judgment.' [Citations omitted.]" *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003). As an appellate court, we do not reweigh the evidence or redetermine facts. *State v. Robertson*, 279 Kan. 291, 300, 109 P.3d 1174 (2005).

The statements that Woolverton sought to suppress were those made when Roth and another detective with the Prairie Village, Kansas, police department traveled to Woolverton's apartment to speak with him about the alleged incident. Roth testified that upon contacting Woolverton, he asked Woolverton if he was free to talk at his apartment. Woolverton suggested that they talk outside of the apartment. The detectives ended up talking with Woolverton in the stairwell between the fifth and sixth floors of the apartment building. At the outset of the interview, the detectives told Woolverton that they were there to discuss the incident involving Rotski but that he would go back to his apartment at the conclusion of the interview and would not be going to jail. Roth testified that during the interview, Edwards checked on Woolverton in the stairwell and Woolverton assured her that everything was fine. Roth indicated that it was clear that Woolverton would be returning upstairs.

Woolverton testified that he did not feel he was free to leave during the questioning. Nevertheless, Woolverton never told the detectives that he wanted to leave the interview. According to Woolverton, he asked the detectives initially if he had to talk with

them. The detectives told Woolverton that they could get a warrant and come back and take him to the police station. Woolverton took the detectives to the stairwell and spoke with them there. One of the detectives stood in front of him and the other detective stood beside the railing of the stairs. The stairwell door was directly behind the officers, but that door was not the only way out of the stairwell.

Woolverton indicated that he thought was going to speak with the detectives for only a minute and that he was just trying to cooperate. Woolverton testified that he thought he was possibly going to jail. Nevertheless, Woolverton was told by the detectives that nothing was probably going to come of the incident after the district attorney looked at the case. Woolverton stated that a couple of people walked into the stairwell during the interview. Woolverton testified that Edwards checked on him a couple of times in the stairwell but he never told her he was going to be right upstairs.

During the interview, Woolverton admitted that he told Rotski, "I'll fucking kill you," during the December 26, 2003, calls. Woolverton admitted that he was angry when he made this threat but told the detectives that he was wrong and that he would never hurt Rotski or his daughter. During the interview, the detectives obtained a written statement from Woolverton.

Roth testified that the interview lasted approximately 1 hour. Woolverton was never handcuffed, and no weapons were drawn by the detectives during the interview. Woolverton was not taken into custody at the conclusion of the interview. In fact, Roth testified that neither he nor the other detective interviewing Woolverton could take a person into custody in Missouri.

Before trial, Woolverton moved to suppress the statements made during his interview with the police detectives. Woolverton maintained that he was in custody and had not been *Mirandized* when the detectives elicited statements from him. After conducting a hearing at which it heard testimony from Woolverton and Roth, the trial court found that Woolverton was not in custody at the time the statements were made and denied Woolverton's motion to suppress. Woolverton renewed his objection at trial when the State sought to introduce evidence of his statements.

On appeal, Woolverton argues that he was submitted to a custodial interrogation because a reasonable person in his situation would have believed he was not free to leave. Under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), a prosecutor is prevented from using statements stemming from a custodial interrogation unless the prosecutor proves that certain procedural safeguards were used to obtain the waiver of the defendant's privilege against self-incrimination. *State v. Benoit,* 21 Kan. App. 2d 184, 189, 898 P.2d 653 (1995).

"*Miranda* warnings are not required for noncustodial questioning; they are required for custodial questioning." *State v. Dang,* 267 Kan. 198, 204, 978 P.2d 277 (1999). Custodial interrogation is defined as " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Benoit,* 21 Kan. App. 2d at 189 (quoting *Miranda,* 384 U.S. at 444). "An objective standard is used to judge whether an interrogation is 'custodial.' The proper analysis is how a reasonable person in the suspect's position would have understood the situation. [Citation omitted.]" *State v. Jacques,* 270 Kan. 173, 186, 14 P.3d 409 (2000).

In *Jacques,* 270 Kan. at 186, our Supreme Court set forth the following factors to consider when determining whether an individual was submitted to a custodial interrogation:

"(1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and the defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or as a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation—whether the defendant left freely, was detained, or was arrested. The importance of each factor varies from case to case. [Citation omitted.]"

When applying the above factors to the facts of this case, we determine that the trial court properly determined that Woolverton was not submitted to a custodial interrogation. The interview occurred in a location chosen by Woolverton: the stairwell of the

Missouri apartment building where he was staying. Two Kansas detectives interviewed Woolverton. No weapons were drawn, and no handcuffs were used at any time before, during, or after the interview. Other individuals were allowed to enter the stairwell, including Edwards who was checking on Woolverton. Although Woolverton was being questioned as a suspect, the detectives told him that he would be free to leave after the questioning and that he would not be going to jail. Woolverton never asked to end the questioning. At the conclusion of the interview, Woolverton was not taken into custody and was allowed to return to his apartment.

Woolverton focuses on the fact that when he asked the detectives if he had to talk with them, the detectives told him that they could get a warrant and come back and take him to the police station. Nevertheless, this exchange indicates that Woolverton knew he had a choice: either he could talk with the officers then or he could refuse to talk to the officers and wait to see if they had enough evidence to obtain a warrant to take him into custody. Thus, Woolverton was aware that the officers could not take him into custody when they came to his apartment and told him they wanted to speak with him.

Because Woolverton was not submitted to a custodial interrogation, the detectives were not required to give *Miranda* warnings before questioning him. Woolverton's statements made during his interview with the detectives were admissible at trial. We determine that the trial court properly denied Woolverton's motion to suppress.

Affirmed.